[Crim. No. 13077. Second Dist., Div. Five. Aug. 18, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JERRY BOYD SMITH, Defendant and Appellant.

Jerry Boyd Smith, in pro. per., and Daniel L. Dintzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and David Gould, Deputy Attorney General, for Plaintiff and Respondent.

STEPHENS, J.—In an information filed by the District Attorney of Los Angeles County, defendant was charged with a violation of section 23105 of the Vehicle Code (driving under the influence of narcotics.) Two prior convictions were alleged. Defendant entered a plea of "Not Guilty" and denied the priors.

Defendant personally and all counsel waived trial by jury. Defendant was found "Guilty" as charged. The court found the priors to be true. A probation officer's report was ordered. Probation was denied and defendant was sentenced to the state prison for the term prescribed by law, which sentence was ordered to run concurrently with the two sentences now being served by defendant. A timely notice of appeal was filed.

*Facts*

During the evening of July 1, 1966, at approximately 9:45 p.m. Officer David L. Moore and his partner, Officer Ervin C. Mesenbrink of the Los Angeles Police Department were on patrol in an unmarked police vehicle[1] in the area of 109th Place and Willowbrook Streets. Officer Moore first observed defendant, accompanied by a female passenger, driving a 1957 Chrysler northbound on Wilmington from Imperial Highway. Defendant was driving very slowly, about 15 miles per hour, causing about eight vehicles to be backed up behind him.

Officer Moore pulled in behind him, about four cars behind defendant's car. Defendant continued to drive slowly for another block and a half, and his vehicle was weaving back and forth. Defendant then sped up to 30 miles per hour, drove about half a block at that speed, then slowed back to about 15 miles per hour. He made a left turn on 111th Street, and appeared to be slumped over the steering wheel as he drove. Defendant then pulled to the right curb and drove along the curb lane about two or three miles per hour. When he reached the corner of 111th and Willowbrook he sped up and made a right turn, going northbound on Willowbrook.

---

[1]Both officers were in uniform, however.

Officer Moore flashed a red spotlight on defendant's car and he pulled over and stopped at 109th Place and Willowbrook. Defendant opened the driver's door and swung both legs out onto the street, keeping seated in the vehicle. The patrol car's headlights were shining on defendant, and Officer Moore observed that he was wearing a short sleeved shirt.

As Officer Moore approached defendant, he observed scar tissue which followed the veins on defendant's lower left arm. The marks were on the inside of the left elbow, along the left side of the forearm and on the left wrist. Officer Moore, using the light of the patrol car headlights and his flashlight, noted numerous scab marks on the scar tissue on defendant's arm. He further noticed three marks on the wrist area which appeared to be bleeding. Officer Moore asked defendant if he had used narcotics, and defendant stated no, "that he had been drinking."

Officer Moore then walked defendant back near the police vehicle into a dark area. Using his flashlight he checked defendant's eye reaction, holding the flashlight beam away from his eye so the pupil may expand and then moving the light beam over the eye to see if there is any reaction to the light. Defendant's pupils were pinpointed and did not expand or contract when exposed to the light. At the time he was conducting the test Officer Moore was standing right in front of defendant, but he did not smell anything on defendant's breath.

Officer Moore placed defendant under arrest and informed him of the charge. Defendant's speech was thick, but understandable, and he appeared to be sleepy. Officer Moore then searched defendant and his car, and found an eyedropper containing a brownish residue in the glove compartment.

Defendant was then transported to the narcotics division. During the time that defendant was being transported to the narcotics division he became very drowsy to the point of almost passing out completely upon arrival at the narcotics division.

Defendant entered the narcotics division office and Officer Charles Wilson, an expert in the field of narcotics, asked him to go into an adjacent interrogation room and have a seat. Officer Wilson left the room to pick up a flashlight and a magnifying lens. When he returned, approximately five seconds later, defendant was seated at a chair at the table, one arm on the table. His head was hanging between his legs, and his other arm hanging limp towards the floor.

714

Officer Wilson roused defendant and asked him to sit up. He told defendant that ". . . he had a right to an attorney, a right to remain silent; anything he said could be used against him; if he could not afford the services of an attorney, a Public Defender would be provided for him." Officer Wilson asked him if he understood these rights, and he just looked at Officer Wilson with a blank look and said nothing. Officer Wilson repeated what he had said and defendant still said nothing.

Officer Wilson observed in the inner area of defendant's left elbow an "old track" or old scar tissue in which there were approximately seven scabs varying from 7 to 21 days old. Further down the arm were several "old tracks" one of which had six scab puncture marks varying in age from 15 to 21 days old. With the aid of the magnifying glass Officer Wilson was able to observe three puncture marks, from which there was exuding a clear fluid. These marks appeared to be fresh, having been made within a matter of hours.

Defendant and Officer Wilson then entered a small side room and closed the door. After waiting a few moments, Officer Wilson performed a light accommodation test on defendant's eyes by bringing the flashlight from the rear to the side of defendant's head and observing the response of his pupils. The pupils of defendant's eyes remained approximately 1.5 millimeters in size despite the change in the amount of light to which his eyes were exposed.

Officer Wilson took defendant back to the interrogation room and spoke to several other officers in the room. During this time defendant was very inattentive and in ". . . street vernacular, he was nodding." Defendant did not make any complaint of illness and Officer Wilson did not smell alcohol on his breath.

Defendant contends that: (1) there was insufficient evidence to establish appellant's guilt beyond a reasonable doubt: (2) the trial court erred in permitting a police officer to testify to his opinion concerning the defendant's medical condition.

▉ The crime of driving an automobile while under the influence of a narcotic drug consists of three elements: (1) driving an automobile; (2) on a highway; (3) being under the influence of a narcotic drug. (Veh. Code, § 23105.) ▉ The first two elements are established without contest; it is the third to which defendant directs his contentions.

While it is true that no blood sample or other mechanical or

chemical test was taken or made of the defendant to establish that his condition was the effect of the use of narcotics, this is not the only type of evidence which will sustain the finding of "under the influence of a narcotic drug." We recognize the general rule that whatever may be established by direct evidence in a criminal case may be established by circumstantial evidence. (20 Am.Jur.2d, Evidence, § 266; *United States* v. *Agueci* (2d Cir. 1962) 310 F.2d 817, 828; *Toliver* v. *United States* (9th Cir. 1955) 224 F.2d 742.) The detailed testimony of the observable physical and mental reactive state of the defendant was testified to by police officers experienced in observing such details. The opinion as to the cause of defendant's condition, if admissible as expert opinion, was sufficient to prove the fact.

[4] It then becomes necessary to answer the second contention, i.e., admissibility of opinion testimony, prior to arriving at a conclusion as to the sufficiency of the evidence question. The officer whose opinion testimony is in question was sought to be qualified as an expert. The testimony was as follows:

"Q. [Mr. Hertzbrun, Deputy District Attorney]: Your occupation and assignment, please. A. [Officer Wilson] I am a police officer employed by the City of Los Angeles, assigned to the Detective Bureau, Narcotics Division.

"Q. How long have you been with the Narcotics Division? A. With Adult Narcotics approximately two and a half years.

"Q. I noticed you said 'Adult Narcotics.' Did you have juvenile work? A. Yes, I have.

"Q. How long? A. I worked on and off approximately one year.

"Q. Is that also in a narcotics field? A. Yes.

"Q. Now, have you had special training and experience in narcotics work before you qualified for that job? A. Yes, I have.

"Q. What did that consist of? A. Well, in 1952 I first received my medical training in Fort Sam Houston, San Antonio, Texas.

"I was in the Air Force attached to the Army Hospital.

"I completed a year and a half course in the medical evacuation group in which I was taught anatomy, circulatory system, the use of opiates such as morphine, and Demerol for the purposes of evacuating wounded military personnel from Korea.

"After my training I was sent to Tachikawa, Japan, where

I stayed a little in excess of two years doing said work in the medical field.

"I returned to the United States and spent a year at Oxnard attached to the TAC hospital there, tactical hospital.

"I spent a year at Camarillo State Hospital working as a psychiatric technician in the disturbed ward in which I administered Dolophine and morphine for doctors' prescriptions.

"During this time I observed many, many hundreds of people under the influence of opiates. I administered these injections to some of them repeatedly over a period of weeks so that I had a chance to observe the effects and the rate at which puncture marks would disappear.

"I received additional training when I entered the police academy, very briefly. I subsequently was assigned to a plainclothes unit approximately six years ago, which narcotic arrests have been 30 to 40 percent of the arrests I have made.

"I have attended Los Angeles State Narcotics Institute on two occasions, completed said courses.

"I am a member of the State Narcotics Bureau. I was assigned to Juvenile Narcotics for approximately a year, on and off.

"I have been assigned to the Adult Narcotics two and one-half years.

"I have completed two and one-half years of pre-medical training, local city college.

"I have examined hundreds of narcotic addicts, people coming in for bookings, approvals. I have made approximately in excess of five to six hundred arrests.

"I have worked as an undercover agent making buys. I have seen people administering heroin to themselves. I have arrested them. I have watched their behavior pattern thereafter.

"Q. Have you qualified as an expert in narcotic investigative work, specifically in the recognition of marks, in Courts in Los Angeles County? A. Yes.

"[Mr. Gessler, Deputy Public Defender] : To which I object as to whether he is an expert before this Court.

"[THE COURT] : I will overrule the objection. The fact that he has testified, I think, may be considered.

"Of course the fact that other Courts may have considered him qualified is not binding on this Court.

"Q. [By Mr. Herzbrcn] : Approximately how many times? A. I have perhaps testified in Los Angeles City alone a couple of hundred times as an expert in Superior Courts."

" [Voir Dire Examination]

"Q. [Mr. Gessler] : Officer Wilson, you testified that you spent some time taking medical training while you were in service; is that right? A. That is correct.

"Q. How long ago was that, sir? A. As I previsously testified, that was in 1952. I spent approximately 16 months.

"Q. That was part of your Air Force training, was it? A. Yes, initially.

"Q. And you received this training to become a Medic; is that correct? A. Yes.

"Q. How much actual training time did you spend to become an Air Force Medic, sir? A. I was in school for 16 months.

"Q. The entire 16 months to learn to be a Medic? A. Yes.

"Q. Where was that? A. Fort Sam Houston.

"Q. While you were in school learning to be a Medic, you did not have any courses dealing strictly with narcotics, did you? A. Yes.

"Q. How many courses did you have dealing strictly with narcotics? A. I don't recall exactly. It was perhaps—they spent two or three weeks, over a two-or-three-week period of time they spent several hours each day dealing with narcotic addicts and recognizing symptoms.

"Q. Those courses were predominately concerned with administration of narcotic drugs to injured and wounded people, weren't they? A. No, that is not correct.

"Q. Then did you serve as a Medic in the Air Force? A. Yes, for four years.

"Q. Four years as a Medic? A. Yes.

"Q. Officer, you have never actually attended an accredited medical school for any courses, have you? A. No, sir; I have not.

"Q. You have not yet undertaken any study to become a doctor of medicine in the State of California, have you? A. No sir; I have not.

" [Mr. Gessler] : No further questions."

The exact question posed by defendant here has been heretofore answered, adversely, by this court. In *People* v. *Mack* (1959) 169 Cal.App.2d 825, 830-831 [338 P.2d 25], it is stated: "The last assignment of error is that the court erred in permitting Officer O'Grady to testify that in his opinion Barbara was under the influence of heroin. The contention apparently is that the witness was not qualified to express an

opinion. The only argument made in this respect is that 'the subject of narcotics addiction is a medical matter which should only be testified to by medical men, and that the use of non-medical persons to give their opinions is erroneous and prejudicial.' No authority is cited in support of the point. The qualification of a person to testify as an expert witness is a matter within the sound discretion of the trial court; and its determination, in the absence of a clear abuse, will not be disturbed by a reviewing court. (19 Cal.Jur.2d 23, § 296.) For one to be competent to testify as an expert he must have acquired such special knowledge of the subject matter about which he is to testify, either by study or by practical experience, that he can give the trier of fact assistance and guidance in solving a problem for which his own good judgment and average knowledge is adequate. (*People* v. *Horowitz,* 70 Cal.App.2d 675, 689 [161 P.2d 833]; *Enos* v. *Montoya,* 158 Cal.App.2d 394, 399 [322 P.2d 472].) Where the witness discloses special knowledge of the subject on which he undertakes to give his opinion as an expert, the question of the degree of his knowledge goes to the weight of his testimony rather than to its admissibility. (*Pfingsten* v. *Westenhaver,* 39 Cal.2d 12, 20 [244 P.2d 395]; *People* v. *Johnson,* 153 Cal.App. 2d 564, 567-569 [314 P.2d 751].)

"We think it patent the witness was well qualified to express an opinion as to whether Barbara was under the influence of heroin." (See also *People* v. *Gurrola* (1963) 218 Cal. App.2d 349 at 353 [32 Cal.Rptr. 368]; *People* v. *Hernandez* (1961) 188 Cal.App.2d 248, 250 [70 Cal.Rptr. 267]; Witkin, Cal. Evidence (2d ed. 1966), § 411, p. 370.)

Defendant's reliance upon *People* v. *O'Neil* (1965) 62 Cal. 2d 748 [44 Cal.Rptr. 320, 401 P.2d 928] is misplaced. In that case it was admitted by the prosecution that O'Neil was not "under the influence of narcotic drugs" at the time of apprehension. That case turned solely upon the correct test as to what an "addict" constituted as used in section 23105 of the Vehicle Code.

Since we have concluded that the expert opinion was properly admitted, the evidence that defendant was under the influence of a narcotic drug is sufficient to support the third element of the crime here charged. Again, the case of *People* v. *Mack, supra,* 169 Cal.App.2d 825 is directly in point. On page 830, the court said: "The testimony of Officer O'Grady with respect to Barbara's condition and his opinion that she was under the influence of heroin was sufficient to establish

that someone had furnished her with heroin. Such evidence, together with the fact that no prescription had been issued to her, established the corpus delicti. (*People* v. *Waack,* 100 Cal. App.2d 253, 254 [223 P.2d 486].)''

The judgment is affirmed.

Kaus, P. J., and Hufstedler, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 11, 1967.